**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

              v.

SKYE XU,

                    Defendant.

No. 23 CR 133 (JMF)

**DEFENDANT SKYE XU's REPLY BRIEF**
**IN SUPPORT OF SENTENCING MEMORANDUM**

Michael Zweiback
Lillian Chu
Jeremy Masys
**ZWEIBACK, FISET & ZALDUENDO, LLP**
315 W. 9th Street, Suite 1200
Los Angeles, California 90015
Telephone: (213) 266-5170
michael.zweiback@zfzlaw.com

Defendant Skye Xu, by and through his counsel of record, Michael Zweiback, Lillian Chu, and Jeremy Masys, hereby submits defendant's reply brief in support of his sentencing memorandum for the Court's consideration.

## I. INTRODUCTION

In its sentencing memorandum, the government requests the Court sentence Polar Air Cargo ("Polar") vendor Skye Xu to the same term of imprisonment received by Polar insider and COO Lars Winkelbauer ("Winkelbauer"). In its call for a 48-month term of imprisonment for Mr. Xu, the government ignores the marked disparity in power, participation, and control over the scheme between Winkelbauer and Mr. Xu, including:

- Winkelbauer's position of authority as COO and second-in-command at Polar (a role that carried a fiduciary duty to Polar), compared to Mr. Xu's position as an external vendor;

- Winkelbauer's position in the hub of the conspiracy,[1] compared to Mr. Xu's role as one of the scheme's most distal participants;

- Winkelbauer's participation in the scheme for over 10 **years**,[2] compared to Mr. Xu's participation of approximately 10 **months**; and

- Winkelbauer's harm to Polar, calculated at nearly $33 million dollars,[3] compared to Mr. Xu's estimated harm, according to Polar, of approximately $1.4 million dollars.

The government's proposed sentence would ensure Mr. Xu, along with COO Winkelbauer, received the highest term of imprisonment amongst all the defendants. Indeed, 48 months is significantly higher than other leaders of the scheme, including Abilash Kurien ("Kurien") (32

---

[1] The government describes his role as: [Winkelbauer] sat at the top of the long-running, highly damaging scheme charged in this case. He was the most senior Polar executive involved. Of the defendants charged in this case, he received kickbacks or illegal ownership distributions from the greatest number of customers and vendors . . . ECF No. 275 at 16.

[2] According to the government, Winkelbauer made a choice "every day for more than ten years to seek illegal payments…." *Id*. at 18.

[3] Based on the restitution request made by the government and ordered by the Court.

months)[4] and Frank Filimaua ("Filimaua") (one year and one day)[5].  Kurien and Filimaua were both Polar executives that recruited vendors, collected payments, and abused their positions of power at Polar to facilitate their scheme for over a decade.

To justify such an extreme sentencing disparity, the government relies on arguments generic to any the defendants in the scheme, including the seriousness of the conduct, harm to Polar, need for general deterrence, and the challenges in detecting kickback schemes.  *See* Gov't Sent'g Mem. at 22-25.  None of these arguments are specific to Mr. Xu.  Indeed, they ring even more true for the Polar executives than for Mr. Xu, who was recruited by the Polar defendants in 2020 at the tail-end of their long-running kickback scheme.  The disparity is particularly unwarranted when considering that Mr. Xu had no bargaining power regarding the payments, as all the power and control over the scheme lay with Winkelbauer, Kurien, and Filimaua.  They dictated who was brought into the scheme, what payments would be made, and how payments would be made.

Given none of the government's arguments for a higher sentence are unique to Mr. Xu, the only explanation for the government's sentencing request is that Mr. Xu continued to investigate his case and held the government to its burden up until the status conference, when he accepted responsibility by pleading to the every count in the indictment.[6]  Notably, the government's recommendation is **double** the probation's recommendation for Mr. Xu.  If

---

[4]  ECF No. 450.

[5]  Case No. S31 22CR261-001, ECF No. 44.

[6]  As mentioned multiple times in the government's brief, "Xu is the last of the ten charged defendants to be convicted, pleading guilty to the Indictment on October 22, 2024, less than a week before his trial was scheduled to begin on October 28, 2024."  Gov't Sent'g Mem. at 9.  Mr. Xu does not dispute that he investigated his case, the government's proposed loss amounts (which were calculated by Polar with little transparency), and his defenses in this case for one and a half years.  The question for the Court is whether this perceived delay by Mr. Xu in pleading guilty should place him at the height of the sentences ordered in this case.  The defense contends that this would be a disproportionate trial tax.

ordered, the government's recommendation will undoubtedly have the intended dampening effect on defendants exercising their right to investigate and explore defenses up to trial.

For the reasons discussed in the defense sentencing memorandum, and detailed in this reply, the Court should consider a term of imprisonment well below the government's recommendation and at the lower range of the sentences already imposed in this case. The defense requests a term of imprisonment of one year and one day, and three years of supervised release. This sentence aligns with Mr. Xu's actual conduct and the mitigating factors in this case, and is sufficient but not greater than necessary to meet the goals of sentencing.

## II. ARGUMENT

### A.    § 3553(a)(2)(A)-(B) Does Not Justify The Extreme Sentencing Disparity Proposed By The Government

The government acknowledges that a below-Guidelines sentence is warranted given Mr. Xu's significant mitigation, but argues for the highest sentence imposed in this case based on "the seriousness of his crime and its effects on his victim and the public and to deter others from committing similar types of difficult-to-detect corporate fraud." Gov't Sent'g Mem. at 22. But these factors apply equally or more to the Polar insiders. These insiders, however, have received sentences ranging from 6 months imprisonment (Llewellyn) to one year and one day (Filimaua) to 18 months (Schirmer) to 32 months (Kurien), with the significantly highest sentence being 48 months for Winkelbauer. While Filimaua cooperated, the others did not.

It makes no sense for Mr. Xu to receive a disproportionately high sentence compared to the Polar defendants, most of whom owed and breached a fiduciary duty to Polar by orchestrating the scheme, including recruiting and puppeting vendors to enable it. Each of the Polar defendants participated in the kickback scheme for many years longer than Mr. Xu. One of the few vendors sentenced so far, Patrick Lau ("Lau"), received a sentence of 18 months, but he participated in the scheme for over five years and caused four times the harm as Mr. Xu. ECF

No. 271.[7]  Indeed, except for Carlton Llewellyn ("Llewellyn"), the other defendants each caused more harm to Polar than Mr. Xu, based on Polar's own calculations, and in amounts ranging from $6.1 million to nearly $33 million.  These numbers stand in stark contrast to Polar's own calculation of the $1.4 million in loss supposedly attributable to Mr. Xu.

Review of a chart submitted by the government in a different sentencing summarizes the years of participation and loss amounts attributable to the defendants in this case:

| Defendant | Years of Participation in Conspiracy | Role (Vendor or Executive) | Loss Amount | Profit | Guidelines Range (Months) | Sentence (Months) |
|---|---|---|---|---|---|---|
| Kurien | 2012-2021 | Executive | $22,956,341 | $7,192,064.41 | 57-71 | 32 |
| Lau | 2016-2021 | Vendor | $6,108,849 | $1,735,694.04 | 30-37 | 18 |
| Llewellyn | 2019-2021 | Executive | $305,800 | $347,879.44 | 24-30 | 6 |
| Schirmer | 2014-2021 | Executive | $9,740,749 | $983,759.32 | 46-57 | 18 |
| Winkelbauer | 2010-2021 | Executive | $33,539,396 | $6,774,039.30 | 121-151 | 48 |
| Filimaua | 2009-2021 | Executive | $29,104,107.30 | $5,906,725.67 | 87-108 | 12 + 1 day |

*United States v. Frank Filimaua*, EDNY 22-261-JMF, ECF No. 38 at 24.  Review of the government's chart reveals that, by far, the sentences in this case have reflected the quantified harm caused by each particular defendant, as well as their level of power, participation, and control in the conspiracy and its multiple spokes.[8]  This means a custody term near the government's recommended sentence would be inconsistent with the other sentences imposed in this case.

Even if the timing of Mr. Xu's plea is considered an aggravating factor for sentencing, it is hard to imagine it is as or more serious than the aggravating conduct of Winkelbauer, who needed to be extradited from a foreign country to face his case, or Filimaua, who violated his

---

[7] Vendor Robert Lutterman ("Lutterman") was also recently sentenced and received a term of two years probation.  *United States v. Lutterman*, EDNY Case No. 22-261-JMF, ECF No. 48.  Lutterman appears to have received cooperation credit.  Notably, his restitution amount is significantly higher than Mr. Xu:  $4,336,123.00.  *Id*. at 5.

[8] This chart has been altered only to include the sentence imposed on Filimaua, which is notably low when considering his years of participation and loss amount.  That is at least partially attributable to his cooperation.

conditions of release by requesting and accepting an additional kickback payment resulting in a new charge being filed.  *See id.* at ECF No. 14.  In contrast to Winkelbauer and Filimaua, Mr. Xu flew from China to the United States when he heard about the indictment in this case and has complied with all conditions of release.  His performance on pretrial supervision has, among other things, demonstrated to Probation that he is at low risk of recidivism.  ECF 451 at 57.  Probation recommended a significant downward variance to 24 months of imprisonment, similar to its recommendation for Schirmer.  *Id.* at 55.

Studying each of the government's arguments under § 3553(a) provides no further justification for the marked sentencing disparity, and instead calls for a sentence towards the lower end of the sentences already imposed.

1.    *The seriousness of the offense and promoting respect for the law*

The government cites to the seriousness of the offense and the need to promote respect for the law to justify a significant sentencing disparity.  Gov't Sent'g Mem at 22-24.  No doubt Mr. Xu's conduct here is serious, as he has acknowledged through his acceptance of responsibility and by pleading to every count in the indictment.  Mr. Xu's conduct, however, is less serious, and arguably significantly less serious, than that of the Polar defendants.  The government even acknowledges that "Xu's scheme was ***merely one part of a criminal enterprise*** that ran for more than a decade and touched nearly every part of Polar's operations."  *Id*. at 24 (emphasis added).  Indeed, it is Winkelbauer, Kurien, Filimaua, Schirmer, and Llewellyn that participated in more or all parts of the criminal enterprise, and most did so for more than a decade.  Considering that alone, their sentences should be higher than Mr. Xu.

Additionally, as part of this argument, the government raises mitigation information provided in Mr. Xu's brief as a red herring.  The reasons Mr. Xu committed his offense are mitigating, but have no bearing on the seriousness of the offense.  Mr. Xu does not argue that it does.  Rather, the fact that Mr. Xu was abused by his father, driven to succeed due to his childhood trauma and stress in his home life, groomed by Filimaua, and affected by the circumstances unique to the COVID-19 pandemic weigh in favor of a downward variance on

mitigation grounds. Nor does Mr. Xu attempt to argue that his conduct was "a one-time aberration" (*id.* at 23), unless the government is referring to Mr. Xu's otherwise crime-free life, which is true and reflected in his lack of criminal history. Rather, Mr. Xu acknowledges that he participated in the scheme for ten months and asks for a sentence reflective of that, i.e. a meaningful term of imprisonment commensurate with his role in the offense and fair when compared with the other sentences imposed in this case for the more serious participants.

While the seriousness of the offense and the need to promote respect for the law are factors that the Court must consider, they also must be weighed against Mr. Xu's meaningful mitigation, letters of support regarding his life history and character, and the need to avoid unwarranted sentencing disparities. Additionally, acknowledgment of the seriousness of the offense and the need to promote respect for the law have been achieved in ways beyond imprisonment, including the significant business and reputational harm to Mr. Xu. Not only has his life been turned upside-down through this criminal prosecution, but his business, employees, and family have suffered. Recently, multiple banks have closed Mr. Xu's companies' business accounts and both vendors and customers have taken advantage of this case and its media attention to refuse to pay Mr. Xu's company.

     2.    *The need for deterrence and the challenges in detecting kickback schemes*

The government argues that "[a] sentence of at least 48 months' imprisonment is also necessary to ensure general deterrence." Gov't Sent'g Mem. at 24. The government cites to the prevalence of kickbacks in the air cargo industry as a reason to sentence Mr. Xu to the high-end of the range of the sentences in this case. *Id.* (discussing witnesses who told the government that this conduct was considered "par for the course"). Concerns regarding general deterrence do not, however, justify the government's requested term of imprisonment for Mr. Xu.

First, it is the prosecution and sentencing of the Polar insiders that best achieves general deterrence. The airline employees that solicit kickback payments are driving this industry practice. It should go without saying that there is substantial difference in bargaining power between the airlines and the much smaller freight forwarding companies and other vendors that

rely on purchasing cargo space from the airlines to service their customers. This case illustrates that power differential, as the small businesses that relied on Polar's cargo space to survive had to pay kickbacks to Polar executives to facilitate business dealings and contracts with Polar. In this pay-to-play system, there is little dispute that it was the Polar executives calling the shots—including, in Mr. Xu's case, demanding the payments, calculating the payments, using personal email addresses to discuss the payments, creating the invoices for the payments, and directing Mr. Xu to make the payments to shell companies—not the vendors. While the vendors that participated did gain a competitive advantage over other vendors, the government acknowledges the industry-wide practice of soliciting kickbacks would make this a common, perhaps necessary, evil for survival for vendors. If kickbacks were demanded from the vendors, as they were here, and the vendors refused to pay, the vendors would simply be unable to compete. More severe punishments for vendors, rather than airline insiders, will do little to dissuade this industry practice. Airline employees will always be able to find a vendor desperate or vulnerable enough to be taken advantage of. Harshly sentencing a vendor while awarding lighter sentences to corrupted airline executives sends the exact opposite message necessary to deter the industry practice.

Second, general deterrence has been achieved in this case simply by the public nature of this prosecution, which included publicizing the firing of top Polar executives, large orders of restitution and forfeiture, and terms of imprisonment. The case has drawn significant attention within the industry, and whether Mr. Xu receives one of the highest sentences in this case, or a more appropriate sentence towards the lower end of the range, does not change the deterrence that has already been achieved.

Third, while general deterrence is a traditional goal of sentencing, all the § 3553(a) factors must be considered by the Court and, in this case, general deterrence does not outweigh Mr. Xu's mitigation and the need to avoid unwarranted sentencing disparities to bring Mr. Xu's sentence to the top of the range for sentences imposed in this case.

Under its deterrence argument, the government also suggests that "kickback schemes can often be challenging to detect, investigate, and prove." *Id*. at 25. Regardless whether this is true, it does not support a higher sentence for an outside vendor like Mr. Xu. Even the government acknowledges as part of this argument that "the Executive Defendants controlled much of Polar's operations, and so when an employee or a customer raised concerns, they were in a position to bury them, which they did, multiple times over the course of years." *Id*. There is no debate here that the Polar defendants orchestrated and controlled the scheme, using their positions of power at Polar to avoid detection. There is also no debate that the Polar defendants set up their outside companies to receive payments well before Mr. Xu entered the picture. While Mr. Xu did make payments to the executives' companies, as he has admitted, the more egregious conduct is that of the Polar defendants, who demanded payments and instructed Mr. Xu and others on how to make them. Justice is not furthered in this case by sentencing Mr. Xu higher than the more powerful shot-callers in the scheme such as Kurien and Filimaua. He certainly should not be sentenced to the same term as Winkelbauer, who was the highest ranked executive and arguably the most responsible for the corruption.

Importantly, the government does not insist that specific deterrence calls for a higher sentence in Mr. Xu's case, suggesting that it concedes that Mr. Xu is at low risk of recidivism as determined by Probation. ECF No. 451 at 57. Indeed, as discussed at length in the defense's sentencing memorandum, further specific deterrence is not needed here. He has accepted responsibility in this case and been exemplary on release conditions. Mr. Xu has also suffered overwhelming consequences from this case already, including likely permanent damage to his business and ability to provide for his family, public shame and an irremovable stain on his reputation, and mental anguish. A prolonged term of imprisonment is not necessary to further achieve deterrence. The government's deterrence arguments are better aimed at the Polar executives in this case.

3.      *The value of the Sky X-Polar Charter Agreements does not justify a higher sentence for Mr. Xu compared to the Polar defendants*

In its discussion of the offense conduct, the government details the payments made by Polar under Sky X-Polar Charter Agreements. There is no dispute that Polar paid Sky X Airlines ("Sky X") approximately $46 million under the charter agreements, but while this amount is high, it does not warrant a markedly high sentence for Mr. Xu. First, most of this amount went to pay for the costs of the chartered flights. The government does not dispute that Sky X had to prepay for the cargo space, which cost over $36 million over the duration of the charter agreements. Accordingly, the high dollar amounts associated with the Sky X-Polar Charter Agreements is largely attributed to the costs to secure the cargo space. It is worth noting that Sky X fully assumed the risk of any loss because it prepaid for the cargo space up front. There was no risk to Polar for these flights, only profit if it sold the cargo space. There were flights that Sky X suffered losses on, and these losses were never covered or accounted for by Polar as they were assumed by Sky X.

Second, the high dollar amounts involved with these agreements are also a function of the COVID-19 pandemic, during which cargo space was in shortage and being sold at a premium. This shortage not only drove up the charter costs of the flights, but also the profit associated with these flights. Mr. Xu's conduct in this case was not more serious than other vendors in this case, as the contract payments would suggest. For example, co-defendant Benjamin Wei not only participated in the scheme for well over a decade but helped it evolve from cash payments to the use of sham companies. Lau similarly helped the scheme evolve and participated for over five years. Ultimately, the high dollar amounts associated with the charter agreements should not be used to justify a higher sentence because it does not equate to higher culpability or worse conduct by Mr. Xu.

Third, the harm to Polar from the Sky X-Polar Charter Agreements is estimated to be $1.4 million, significantly less than the harm caused to Polar by its own executives and by other vendors, including Lau who received a restitution order of over $6 million. Vendor Lau's 18

months of imprisonment is one of the best comparisons to Mr. Xu, and given the amount of harm caused, Mr. Xu should be sentenced well below him.

Additionally, in its brief, the government acknowledges that Winkelbauer, Kurien, and Filimaua personally benefitted from the charter agreements by receiving millions. The payments they received went into their pockets. The government overstates Mr. Xu's personal benefit, however, as the charter agreement payments from Polar went to his company, Sky X, and was largely reinvested into his businesses during the challenging months of the COVID-19 pandemic, a time when airlines profits soared but freight forwarders had to scramble for access to the limited cargo space available. *See* Def. Sent'g Mem. at Ex. E.

4. *Mr. Xu should not be further penalized for the timing of his guilty plea*

As detailed in his sentencing memorandum, Mr. Xu's conduct and role in the scheme should place him somewhere between the 18 months of imprisonment imposed on Lau and Schirmer and the 6 months of imprisonment imposed on Llewellyn.

His only true distinguishing factor from Lau, Schirmer, and Llewellyn is that he entered a guilty plea later than they did, choosing to investigate his case until the status conference. But both the sentencing guidelines and the nature of Mr. Xu's guilty plea to all counts accounts for this, as would a sentence above Llewellyn's. If Mr. Xu pled earlier in this case, he would have been placed at the lowest end of the range for sentencing. His position in the range of sentences in this case has moved and he faces more time, which is reflected in the defense request. Mr. Xu should not, however, be moved to the highest end of the sentencing range. That is too high a penalty for exercising his right to investigate his case and explore his defenses.

Although the government falls short of explicitly stating in their brief that Mr. Xu's delayed guilty plea is the reason they are placing Mr. Xu in the same category of culpability and harm as Winkelbauer, the arguments raised in the government's brief fail to justify such a high ask. Mr. Xu is not on par with Winkelbauer; he is nowhere close. He should be sentenced according to where he falls in comparison with the other defendants in terms of his participation and estimated harm, which is lower than almost all the defendants. Taking into account the

10

timing of his guilty plea, he is arguably above the lowest sentence given in this case to Llewellyn, but should not be above Schirmer and Lau, who participated much longer and caused substantially more harm.

**B.      Under § 3553(a), Mr. Xu Should Receive A Sentence Towards The Lower End of the Range of Sentences Imposed In This Case**

Mr. Xu's life's history and his character, as demonstrated through a life of service and overwhelming, consistent support in letters from family, friends, and colleagues, weighs in favor of a sentence of one year and one day of imprisonment. Mr. Xu's decision to join the Army after naturalizing, including completing domestic and overseas missions, illustrates his good character and inclination towards service. Mr. Xu's charity work to help bring PPE into the United States is only further demonstration. Mr. Xu's hard work throughout his life is also worthy of consideration, as he has always worked long hours to build up his companies and now supports over 100 employees, a responsibility he takes seriously. He is a father to three minor children and the primary financial support for them and his wife.

The Court should also consider in mitigation the circumstances in Mr. Xu's life at the time of the offense, including the challenges Mr. Xu experienced with his family life and managing his companies during the COVID-19 pandemic. At this time, Mr. Xu looked up to Filimaua as a mentor and big brother figure. Apparently, Filimaua was aware that he played a role of mentor to others. *United States v. Filimaua*, EDNY Case No. 22CR261-001, ECF No. 33 at 11-12. The mentoring relationship allowed Filimaua to gain the trust of and influence over Mr. Xu. While the circumstances surrounding Mr. Xu's decision making do not excuse the conduct, they do explain how someone with Mr. Xu's history and character would get involved with the Polar defendants' conspiracy and should be considered in mitigation.

Mr. Xu's mitigation, combined with the need to avoid unwarranted sentencing disparities, supports a sentence of one year and one day for Mr. Xu.

**C.      The Government Has Not Met Its Burden On Restitution Or Forfeiture**

The government has not met its burden to establish the restitution amount in this case.  As recognized in *United States v. Tanner*, 942 F.3d 60 (2d Cir. 2019), a case relied on extensively by the government in its discussion of forfeiture, "loss to the victim 'is not a <u>necessary</u> consequence' of all kickback schemes."  *Tanner*, 942 F.3d at 67 (emphasis in original).  "Because the purpose of restitution is compensatory . . . the 'restitution order must be tied to the victim's actual, provable, loss.'"  *Id.* (citing *United States v. Zangari*, 677 F.3d 86, 91 (2d Cir. 2012)).  The restitution ordered "must reflect a reasonable approximation of losses supported by a sound methodology."  *Id.* (citing *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013)).

Polar's loss calculations were distinctly at issue throughout this case.  The government asserts that the Polar's loss calculation of $1.39 million is "the difference between the 30% profit share that Polar would have negotiated in the absence of kickbacks and the 3% profit that Polar received from its kickback-tainted business arrangement with Sky X."  But there is a dearth of reliable evidence to establish that Polar would have negotiated a 30% profit share.  Indeed, interviews with Polar executives suggest that Polar often collected around 3% to 3.5% when it functioned as a GSA, similar to what it made functioning as a GSA under the Sky X-Polar Charter Agreements.  *See*, *e.g.*, Ex. A (Polar executive Kristi Krepp ("Krepp") noting that when Polar acted as a GSA in China, it made a commission of around 3.5% and it made a commission of around 3% as a GSA for DHL).  Ultimately, it is unclear what Polar would have negotiated and how much more, if anything, it would have made.  Polar's loss amount is based on supposition.

Additionally, the government does not deny that Polar profited from the Sky X-Polar Charter Agreements.  Gov't Sent'g Mem. at 30.  Instead, the thrust of its argument is that Polar would have profited more.  *Id.*  ("[T]he issue is that **Polar would have negotiated a more profitable split** of any profits it made from selling cargo capacity in the absence of the kickback arrangement.").  But this does not amount to "actual, provable, loss."  *Tanner*, 942 F.3d at 67.  It is unclear whether the Sky X-Polar Agreements would have existed at all in a world where Polar

would have been able to negotiate a higher profit split.  This does not satisfy the government's burden on restitution.

Just as with restitution, the government has a burden to establish forfeiture by preponderance of the evidence.  That burden lies with the government, and, contrary to the government's contention, cannot be shifted or waived.  The government relies on cases outside of the criminal sentencing context to argue the defendant waives any arguments regarding forfeiture prior to sentencing.  But under Rule 32.2 of Federal Rules of Criminal Procedure and established case law, the Court must make a finding regarding any criminal forfeiture order and the government must establish criminal forfeiture by a preponderance of the evidence to obtain that finding.

Regardless, the defense does not agree with the government that forfeiture should be ordered in the sum of $4,487,830.  Criminal forfeiture is punitive in nature and cannot be unconstitutionally excessive.  *See United States v. Viloski*, 814 F.3d 104, 109–10 (2d Cir. 2016).  Quite simply put, Mr. Xu does not have the money.  His businesses have been terribly impacted by this case, as is his ability to continue providing a living for his three children and wife.  In determining whether a forfeiture amount is excessive, courts may consider whether "the forfeiture would deprive the defendant of his livelihood, i.e., his 'future ability to earn a living.'"  *Id*. at 111.  Mr. Xu is in a position to rehabilitate after serving his sentence and to, again, contribute meaningfully to society as a father, provider, business owner, and good citizen.  Such an overwhelming forfeiture amount will undermine Mr. Xu's future ability to earn a living and provide for his family and employees.

///

///

///

///

## V.    CONCLUSION

For the reasons discussed above, the defense submits that a sentence of one year and one day is sufficient but not greater than necessary to achieve the goals of sentencing.

**DATED**:  May 8, 2025                     Respectfully submitted,

/s/
_____
LILLIAN CHU
MICHAEL ZWEIBACK, ESQ.
JEREMY MASYS
**ZWEIBACK, FISET & ZALDUENDO, LLP**
315 W. 9th Street, Suite 1200
Los Angeles, California 90015
Telephone: (213) 266-5170
michael.zweiback@zfzlaw.com

*Attorneys for Defendant Skye Xu*

14